UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| LISA DOYLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:13-cv-00037-SEB-DML |
| | ) | |
| AMERICAN ELECTRIC POWER | ) | |
| COMPANY, INC. a public owned | ) | |
| company and parent company of the fore- | ) | |
| mentioned, | ) | |
| INDIANA MICHIGAN POWER | ) | |
| COMPANY also known as (AEP); a | ) | |
| division of American Electric Power, | ) | |
| UTILITIES WORKERS UNION OF | ) | |
| AMERICA, AFL-CIO, LOCAL 418 also | ) | |
| known as UWUA, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**


This is a Title VII action brought by Lisa Doyle ("Doyle" or "Ms. Doyle" or

"Plaintiff") against her former employer, Indiana Michigan Power Company ("IMPC")[1],

---

[1] The parties agree that IMPC was throughout all the relevant time periods at issue here the employer of Ms. Doyle. Ms. Doyle, however, has also named American Electric Power Company, Inc. ("AEP") as a defendant in this litigation. We are informed that AEP is a public utility holding company established under the Public Utility Holding Company Act of 1935 and, as such, it has no employees and owns no power generating stations or other property – it simply owns shares of stock. IMPC is apparently one of the many wholly owned subsidiaries of AEP, which are collectively referred to as the "AEP System." Dawson Aff., ¶ 4. In addition, as Defendants have noted, Ms. Doyle failed to identify AEP as the allegedly discriminating employer in her EEOC charge, which omission forecloses the claims against it in this lawsuit. *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013). This is not Ms. Doyle's only omission, since she also left this issue regarding the appropriateness of suing AEP entirely unaddressed in her opposing brief filed in response to Defendants' motions for summary

and union, Utilities Workers Union of American, AFL-CIO, Local 418 ("Union"), in which she alleges that she was discriminated against on the basis of her sex throughout the time of her employment, from 2006 until she was terminated on May 7, 2012, and that she was retaliated against based on having engaged in protected activity. For the reasons outlined below, Ms. Doyle has been unable to demonstrate that there are any material facts in controversy underlying her claims that would foreclose summary judgment or that her claims are viable under the well-established principles of law applicable to her claims. Accordingly, summary judgment shall enter in favor of each defendant.

## Factual Background

Ms. Doyle was hired on at the Tanners Creek Plant located in Lawrenceburg, Indiana, on July 5, 2006, in the position of an EOJ ("Equipment Operator Junior") and assigned to Team Two. Tanners Creek is a coal-burning electric generating power plant operated by IMPC. It houses four separate coal-fired generating units that produce a total output of 995 megawatts of electricity. "Each generating unit has its own control room in which Unit Operators ("UOs") operate and monitor a complex array of switches, dials, and instruments for a boiler, turbine, generator and other associated power generation equipment." (IMPC Br. at 1, citing the Dawson Aff., Exh. A) Equipment Operators

---

judgment. Having failed to respond to this argument, she is deemed to have abandoned her claims against AEP. Accordingly, judgment shall enter in favor of AEP. *United States v. Turcotte*, 405 F.3d 515, 537 (7th Cir. 2005); *Murray v. Golden Rule Ins. Co.*, 23 F. Supp. 3d 938, 955 (S.D. Ind. 2014).

("EOs") check and operate various kinds of equipment under the direction of UOs. Maintenance Mechanics ("MMs") inspect, service, repair, install, and construct equipment and structures at the plant.[2] *Id*. ¶ 9. When Ms. Doyle's employment commenced at IMPC, she had four supervisors: Jeff Hastings, Keith Redwine, Rick Scott, and Steve Trog. (Pl Dep., p. 13). She also became a member of the Union at the outset of her employment.[3] Her tenure at IMPC at the Tanners Creek Plant extended over slightly less than five years.

From the very beginning of her employment with IMPC, Ms. Doyle proved to be a difficult, often uncooperative employee. Hastings Dep., pp 6-10; Exh. 1 to Hastings Aff. Putting aside those negative behaviors, we have parsed this prolix factual narrative advanced by the parties in this litigation to determine whether there is any evidence to support her claims of sex discrimination. In the end, it is clear that Plaintiff's claims – at least those that survive for consideration because of the statute of limitations -- lack both legal and factual support.

---

[2] This was a highly complex and necessarily safety-conscious work place. Maintaining the required safety standards was a critically important priority for all employees and management alike. IMPC employees were required to follow the Clearance Permit Policy and Procedure System ("CPS"), which is based on OSHA's lockout/tagout practices. *See* 29 C.F.R. § 1910.147 ("This standard covers the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees."). No one, including Ms. Doyle, could reasonably dispute that an electrical power plant is a dangerous place to work and that strict adherence to safety rules is therefore imperative. To this end, IMPC provides its employees with extensive, ongoing training.

[3] Defendant Local 418 is the collective bargaining representative for employees at Tanners Creek. It is a small Local Union that represents no other groups and currently has fewer than 50 members. Teke Decl. ¶ 3, Exh. B. Ms. Doyle remained a member of the Union throughout her employment with the Company. Doyle Dep., Exh A, at 175.

Ms. Doyle asserts three causes of action against IMPC and a single claim against the Union, all brought pursuant to Title VII.[4]   In Count I of her Complaint, she alleges that IMPC subjected her to a hostile work environment based on her sex.  Count II alleges that Defendant IMPC retaliated against her for having complained about the unwanted sexual advances of a co-worker, leading to further discrimination and disparate treatment by her co-workers and supervisors.  Count III asserts that she was wrongfully terminated from her employment based on her sex.  Count IV sets out Plaintiff's claims against the Union, wherein she alleges that the Union conducted an inadequate investigation of her claims of discrimination and refused to arbitrate her discharge grievance, in violation of her Title VII rights.

**Employer/Union Conduct Occurring Before August 9, 2011**

Ms. Doyle's allegations of discrimination begin with an occurrence in late October 2006 shortly after she started working at Tanners Creek, when Mark Manford, an EO on Ms. Doyle's shift, made inappropriate, unwelcome sexual contacts and advances towards her.   Ms. Doyle concedes that throughout 2006 and 2007, she never complained about Mr. Manford's improper overtures or contacts to anyone connected with IMPC

---

[4] In the briefing on the summary judgment motions, Ms. Doyle's counsel frequently borrows language from the federal labor laws, suggesting, for example, that the Union breached its duty of fair representation in regard to Ms. Doyle's rights under her union contract.  Ms. Doyle previously filed an unfair labor practice charge with the NLRB claiming a breach of the Union's duty to represent her fairly, but that charge was dismissed.  Union Reply at 13 n.8.   Despite the use of such confusing terminology, it is clear that Plaintiff's only claim against the Union in this litigation is a sex discrimination claim brought under Title VII.  Compl. ¶ 84.  Accordingly, our analysis is limited as well to Title VII principles.

management or Human Resources department, nor did she report them on the Company's Ethics Hotline which existed for such purposes.[5]  Doyle Dep. at 70-72.   Ms. Doyle does say that at some much later time she informally mentioned Mr. Manford's unwelcome conduct to a few of her co-workers, but those reports were not made to anyone connected with IMPC management who would have been in a position to take action on her behalf to vindicate her Title VII rights.  *See Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373-74 (7th Cir. 2007) ("[A]n employer's notice or knowledge of the harassment is a prerequisite for liability.") (internal quotation marks and citations omitted).

Ms. Doyle had another run in with Mr. Manford in April 2007, but it was of a different sort.  She and three co-workers, who together comprised Team Two (one of whom was Mr. Manford), had been instructed to remove coal debris from the path of a coal handling shuttle.   A coal handling shuttle carries coal through the plant.  It is a large, heavy steel bin with wheels that runs on tracks and is operated electronically. Deshong Aff. ¶ 10.  This coal spill occurred in a noisy area of the plant requiring all three team members to wear their OSHA-required earplugs.  When enough coal had been removed from the path, Mr. Manford instructed Ms. Doyle and the other workers to cease

---

[5]  IMPC explains in its brief in support of its summary judgment motion that it assigns a high priority to the training and education of its workforce on issues relating to discrimination, harassment and retaliation.  The Company has produced a written policy regarding anti-discrimination and harassment which is posted on bulletin boards throughout the plant and included in the employee handbook.  Ms. Doyle admits that she had seen these postings on bulletin boards at Tanners Creek. Doyle Dep. at 22. The Ethics Hotline provides a means by which employees can submit anonymous reports of any type to management, and the phone number for the Ethics Hotline is displayed on the back of employees' identification badges. Lastly, all IMPC employees are required to attend annual anti-discrimination and harassment training.  Dawson Aff. Incl. Ex F; Dawson Dep. at 10-12; Zinser Dep. at 23-24.

shoveling and get out of the way so the shuttle could be safely operated. Unsure of whether Ms. Doyle had heard him, Mr. Manford shouted to her to stop shoveling. Mr. Manford's tone of voice reportedly offended Ms. Doyle, prompting her to throw her shovel to the ground and berate Mr. Manford. A short time later, Mr. Manford apologized to Ms. Doyle for having upset her, but apparently Mr. Manford's gesture did not placate Ms. Doyle, because she responded to it with insulting words that broadly impugned the quality of the men who live in southeastern Indiana, to the effect that they obviously do not know how to properly treat their wives and children. This outburst by Ms. Doyle was allegedly overheard by other employees. Thereafter, Ms. Doyle says that she was routinely mistreated by her co-workers, either by their refusing to work directly with her or failing to include her on projects or in training sessions. Ms. Doyle admits that she had no conflict with her coworkers until after the coal spill incident. Doyle Dep. at 47, 87. It is unclear how much of this episode was reported to IMCP managers. Doyle includes it in her evidentiary summary for her Title VII complaint, so we have included these facts in our ruling as well.

The first incidents with Mr. Manford that occurred in October 2006 went unreported by Ms. Doyle until sometime in 2008, after which, she says, she began being denied training she needed in order to be successful in the performance of her duties. Ms. Doyle states that even though the lack of training "appeared to be facially gender-neutral conduct," it was the result of her complaints about Mr. Manford's sexual harassment and was one aspect of the hostile environment in which she was forced to work. Dkt. 59 at 6.

She alleges that, in being directed to perform tasks that required training and skills beyond those required for her position as an EOJ, she was set up to fail, and that her incompetence at that level generated resentments towards her from and by her co-workers, which was another aspect of her hostile work environment.  Pl.'s Br. at 6.

On May 6, 2008, Ms. Doyle's husband telephoned Tim Kerns, then the Tanners Creek plant manager, to complain that his wife was not getting proper training and was being harassed and mistreated by her teammates and co-workers.  Doyle Dep. at 89-92. His complaint was not tied to any claim of sexual harassment towards her; in fact, Doyle has admitted that she experienced no sexual harassment in 2008, 2009, 2010, 2011 or 2012.  Doyle Dep. at 92.  In response to Ms. Doyle's husband's complaint to Tim Kerns, IMPC conducted a thorough investigation that extended over three days.  Ruth Ann Sellers, a corporate human resources officer, visited Tanners Creek and interviewed several people to determine the basis for Ms. Doyle's husband's complaint.  She discovered that a perception did prevail among plant employees that a male employee (Rusty Hountz), who had less seniority than Ms. Doyle, had been promoted to UO and given better opportunities to get training than Ms. Doyle.  Ms. Doyle had complained to Sellers of this specific unfairness, though IMPC notes that she was in error as to the facts, because Mr. Hountz was never actually promoted.  Rather, Mr. Hountz was allowed merely to perform certain tasks ordinarily associated with a higher position than the one he officially held, having been given such opportunities in response to his requests for a chance to do them.

Although Ms. Doyle contends that she told Ms. Sellers during the investigation about the alleged sexual harassment to which she had been subjected by Mr. Manford during the fall of 2006, IMPC disputes that contention. Ms. Sellers reported that she had uncovered no evidence of gender discrimination during her investigation, though she did conclude that certain improvements were needed at the Tanners Creek plant in the form of providing sensitivity training for all supervisors and employees, front-line leadership training, and face-to-face training programs embracing diversity in the workplace. Exh. 3 to Dawson Aff. Ms. Doyle admits that everyone was required to attend harassment training following the completion of the Sellers investigation. Doyle Dep. P 83.

On or about August 30, 2010, Ms. Doyle's work situation took a significant turn for the better, by her assessment, at least, when she was transferred to the Maintenance Department and became a Maintenance Mechanic Junior ("MMJ"). In her new position, she also began working under a new supervisor with a new team. This transfer came a few months after a plant-wide series of reductions in staff and reorganizations of the workforce had become necessary at the Tanners Creek Units in April 2010, due to downturns in the national economy. IMPC devised a proposed restructuring plan to deal with these downturns, which was ratified by the Union and, in August 2010, several EOs, including Doyle, and one of the UOs were reclassified as MMJs. Doyle's new team included Amy Zinser, Kelly Baker, and Nick Hyde. Doyle was very happy with this new arrangement, commenting that the training in particular was "very good because things

were explained in detail in a classroom to everyone at the same time." Doyle Dep. at 106-110.

On February 10, 2011, Ms. Doyle along with three men applied for a newly created job as Performance and Industrial Hygiene Technician Junior (a lab position). Despite the fact that two of the male applicants had more seniority than Ms. Doyle, she was awarded the transfer. Ms. Doyle voluntarily resigned the position a few hours after she started it, however, for reasons personal to her (i.e., a lower salary, "substandard" lab conditions, apprehensions about working with Team Two).

Ms. Doyle's reputation as a difficult employee began not long after she started working at Tanners Creek, and over the years her co-workers came to view her behaviors in highly negative terms -- disruptive, uncooperative, careless, combative and disagreeable. Certain of her co-workers complained about having to work alongside her, preferring instead to keep a safe distance from her to avoid the friction and potential outbursts. Even her friend and fellow team member, Amy Zinser, described Ms. Doyle as "a little headstrong and aggressive," unable to work well with others, who instigated arguments with her supervisors. Zinser Dep. at 38-39, 44-49.

Among her other traits, Ms. Doyle demonstrated that she also was unable or unwilling to follow instructions and to adhere to IMCP's safety policies as set forth in the CPS. In that regard, on July 29, 2011, she committed her first CPS violation, which led

to a five-day suspension from work without pay.[6]  Ms. Doyle's violation entailed her failure to follow the Clearance Permit Procedures, when she removed three red clearance permit tags without authorization, changed the equipment that was tagged, and verbally gave Energy Production operators control of the equipment.  Doyle Dep. at 116-17; Ex 11 to Doyle Dep.  In committing these violations, Ms. Doyle placed at risk for serious injury or death employees who were at the time still actively working on the equipment. These violations were regarded by management as very serious, but Doyle's response, when confronted about her violations, was to laugh about them.  *Id.*

**Employer Conduct and Events that Occurred after August 9, 2011**

Following her suspension for the first CPS violation, Ms. Doyle met with Plant Manager Brian Scragg on August 23, 2011, upon her return to work.  Mr. Scragg testified that he had arranged to have a Union representative present for the conference as required in such circumstances, and for that purpose he had invited Mr. Manford to attend, not knowing of the issues between Ms. Doyle and Mr. Manford that had arisen five years prior, in 2006.  When Ms. Doyle objected to Mr. Manford's participation in the meeting, Mr. Scragg honored her request to have John Wise attend instead.  Mr. Scragg testified that he had had reservations about Ms. Doyle's returning to work, given her failure to comprehend or appreciate the severity of her violations that had led to her suspension, but

---

[6] IMCP has noted that male employees were also disciplined as necessary for their CPS violations, and Ms. Doyle does not contend otherwise.

he decided to give her another chance because, as he put it, he wanted her to succeed. Scragg Dep. at 20-22.

In addition to the suspension, Ms. Doyle was required as a consequence of her violation to participate in "corrective and preventive action . . . to address the issues outlined in the Performance Improvement Plan (PIP)." Exh. 11 to Doyle Dep. She was forewarned that if she failed to complete the PIP within a reasonable timeframe, or to perform her job in a satisfactory manner, further disciplinary measures would result. Ms. Doyle's supervisor, Dave Craig, offered additional assistance to Ms. Doyle to help ensure that she would succeed. Even with the extra help and despite the forewarnings of serious consequences if she did not complete the PIP, Ms. Doyle failed to complete the PIP within the allotted time. In that failure, she further proved herself unable to apply the lessons she was supposed to have learned as a part of the PIP process.

By September 2011, Mr. Scragg had received reports from other employees that Ms. Doyle was exhibiting erratic behavior. With growing concerns about her safety and the safety of other employees, Mr. Scragg placed Ms. Doyle on paid leave and required her to attend six sessions with an Employee Assistance Program ("EAP") counselor of Ms. Doyle's choosing. Scragg Dep. at 15-17; Scragg Aff. ¶ 5. IMPC paid for the counseling sessions, which ran from September through November 2011. Ms. Doyle returned to work on November 29, 2011, after being certified as fit to return by an independent medical examiner. When Ms. Doyle returned to work, Mr. Manford represented her in a meeting with Mr. Scragg, who again laid out his expectations for her

conduct upon her return to work.  Doyle Dep. at 190; Exh. A.  Ms. Doyle did not object this time to Mr. Manford's presence at this meeting.

On December 6, 2011, within a few days of her return to work, Ms. Doyle committed a second, very serious CPS violation.  This time, she and her coworker, Amy Zinser, signed onto the wrong clearance permit signup sheet when, as they both admitted at the time, they had failed to read and follow the proper paperwork.  Thus, once again, potentially dangerous equipment was not secured in a way that would protect employees from possible injury or death.  Ms. Zinser acknowledged her error at the time and was suspended for three days because this was her first CPS violation.  Ms. Doyle was suspended for five days (December 16-22, 2011), reflecting the fact that it was her second CPS violation, and was warned that "[a]ny future SP or Safety & Health policy or procedure violation or normal standards of conduct will result in termination of employment."  Doyle Dep. at 143-145; Exh. 14.  IMPC viewed this violation to be so serious as to warrant the distribution of a notice to all plant employees about the company's concerns as well as a decision to institute a plant-wide stand down to allow all employees to review what had happened in terms of Ms. Doyle and Ms. Zinser's errors of judgment and to conduct specific training in an effort to prevent such violations in the future.

Because of the seriousness of this violation and the fact that it was Doyle's second such event, Mr. Scragg required Ms. Doyle to sign a Last Chance Agreement ("LCA"), informing her that she would be terminated from her employment if she did not sign it.

12

The LCA provided that any further clearance permit or violations of the Company's safety and health procedures would result in termination of her employment. Doyle Dep. Exh. 18, LGA 12/15/11; Doc 47-5 at 157-58. As a part of that Agreement, after reiterating the grave nature of her violations and the risks they had created, Mr. Scragg gave Ms. Doyle four specific directives: "(1) put the past behind and move forward; (2) focus on Doyle's actions – not others; (3) follow all safety and health policies and procedures; and (4) follow all maintenance policies and procedures as directed by Doyle's supervisor or more senior coworkers." IMPC Br. at 13 (citing Scragg Dep. at 23 and Scragg Aff.) Mr. Scragg also assigned a mentor to Ms. Doyle to provide her with one-on-one assistance, which arrangement benefitted her for some time thereafter.

Ms. Doyle was still unable to maintain an entirely clean disciplinary record. Between January and March 2012, she committed a few minor CPS violations. But in March and April 2012, she once again found herself in the middle of committing two highly serious infractions: the first, when she participated in a scaffold building training activity and, with a broken foot, climbed up on the structure in an unsecured and unsafe manner, contrary to the directions of her instructor, thereby putting herself and others at risk of injury; and the second, when she and Ms. Zinser made the unilateral decision to utilize the radial arm drill press, on which neither had been extensively trained, rather than use the recommended torch, to elongate holes in a large steel stand without first seeking instruction or assistance on how to use the drill. As a result, the one-inch diameter, eight inch long drill bit broke and a piece of it went airborne. IMPC

supervisors opined that had the flying object hit another person, it would have caused serious injury or even possibly death. The Safety and Health Supervisor at Tanners Creek, Sonia Deshong, recommended in response to reports about this latest episode that Ms. Doyle needed to be enrolled in a behavioral class so she could "learn how to work as a team member." Dkt. No. 47-11 at 5. Deshong further observed that Doyle "continues to get more aggressive and anger is showing more often." *Id.*

For Mr. Scragg, the drill bit incident was the final straw, prompting him to recommend to his supervisors, including the executive vice president of IMPC, that Ms. Doyle's employment be terminated. Mr. Scragg's recommendation was approved and her employment was terminated on May 7, 2012. She was informed of her termination at a meeting convened and attended by members of Tanners Creek management and Union representatives.

On June 16, 2012, Doyle filed a charge of discrimination with the EEOC against IMPC alleging sex and age discrimination and retaliation. She did not include a claim in her judicial complaint, however, based on age discrimination.

**Plaintiff's Interactions with the Union**

The claims advanced by Doyle against the Union in the EEOC charge include that following her "unjust termination", though the Union filed a grievance on her behalf, it thereafter voted not proceed to arbitration on her claims. Ms. Doyle maintains that the decision to rescind the grievance and not arbitrate it was based on her sex and in

retaliation for her having complained about the Manford harassment, which had occurred five years prior.

Following Doyle's five-day suspension in August 2011, the Union filed a prior grievance on her behalf challenging that action by IMPC. Doyle was represented by a District representative of the UWUA, Bob Fronek, who argued for leniency in her case. The Company offered to settle the grievance by reducing the discipline imposed from a five-day to a three-day suspension, but Doyle was reluctant to agree to this offer. Doyle Dep., Exh. A, at 181-86. The Company insisted that Doyle agree to the PIP as part of the settlement and, if she refused, she could not return to work and would be terminated. On the advice of her Union representative, Doyle signed the agreement and received two days back pay from the Company for the reduction of her suspension. Doyle Dep., Exh 13; Dkt. 47-5 at 159-63.

Following her December 2011 five-day suspension, when the Company presented her with the Last Chance Agreement, Doyle's union representatives repeatedly advised her not to sign that document because of the potentially dire consequences that would flow from any future violations by her, regardless of the significance of the infractions. Ms. Doyle concedes that her union representatives told her they would take a termination grievance to arbitration rather than have her accept the Last Chance Agreement ("LCA"). Ms. Doyle opted to have a final conversation with Mr. Scragg about her situation during which he made clear that, if she did not sign the agreement, she would be terminated. Ms. Doyle did not sign the agreement at that time and her union representatives

continued to encourage her to not ever sign it. In the course of making her decision, Ms.

Doyle, acting on her own initiative, directly contacted various Company representatives

without any Union representatives present. Ms. Doyle acknowledged at the time and in

the course of this litigation that she understood that in signing the LCA she would be

dramatically restricting her right to file a grievance as well as the Union's ability to

advocate on her behalf, if she were to receive further discipline in the future. The Union

representatives reiterated their promise to fight for her by filing a grievance and taking

the matter to arbitration if she refused to sign the LCA, but, contrary to the Union's

advice, Ms. Doyle finally decided to sign it, she said, in order to keep her job.

Ms. Doyle returned to work on January 3, 2012. Just three and a half months later

she and Ms. Zinser were involved in the incident relating to the misuse of the radial arm

drill press. The Company classified the incident as a serious near-miss violation of its

Safety and Health polices and therefore a violation of Ms. Doyle's LCA. On May 7,

2012, the Company terminated her employment, and the Union filed a grievance on her

behalf the next day. Doyle Dep, Exh. 26.

On May 29, 2012, the Union and the Company held a third-step meeting regarding

the discharge grievance, at which Ms. Doyle was represented by the Union's district

representative, Mr. Fronek; the Local President, Mr. Caswell; and Ms. Zinser, who had

recently become the Recording Secretary of the Union. Mr. Fronek and Mr. Caswell met

with Doyle in advance of the meeting to prepare her for what would occur and to discuss

the best way to present her case. Ms. Doyle asserts that the Union did not obtain

adequate information to allow it to succeed at the hearing, though she admitted at her deposition that she thought that by that time the Company had already made up its mind, so there was not much the Union could have done that would have made a difference. Doyle Dep, Exh A at 243, 254-55.

Ms. Doyle was informed that the decision to take her grievance to arbitration needed to be discussed and voted upon by the Union as a whole at its next regularly scheduled meeting. When Ms. Doyle failed to attend that meeting even though she had been given notice of the date, she was unable to personally argue her case to her coworkers. The union members, in assessing Ms. Doyle's situation, determined as a group that there was only a "slim chance" of her winning and, given the expense associated with such an effort, they voted 11 to 1 not to proceed to arbitration on Ms. Doyle's grievance. The Union notified Ms. Doyle of its decision not to advance the grievance to arbitration. There has been no evidence presented to us that ties that decision to Ms. Doyle's gender.

Ms. Doyle's complaint against the Union is that the Union inadequately represented her in the fact-finding hearing following her termination and that it improperly declined to pursue her grievance to arbitration while arbitrating the grievance of similarly situated male union members and that the Union's conduct was therefore discriminatory. She included these allegations against the Union in her EEOC charge filed on June 16, 2012.

**Legal Analysis**[7]

## I.      Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## II.      Discussion

---

[7] Both parties raised various issues regarding the admissibility of certain evidence. However, because we are able to rule without delving into those issues, we need not address them further.

Ms. Doyle has brought four Title VII claims – three against her employer, IMPC, alleging she was subjected to a hostile work environment (Count I), unlawful retaliation as a result of her complaints about sex discrimination (Count II), and discriminatory termination (Count III); and one claim against the Union, alleging the Union discriminated against her because of her sex by failing to allow her to proceed to arbitration on her discriminatory termination claim (Count IV). Before addressing the merits of these claims, we turn first to the statute of limitations issue.

## A.    Statute of Limitations

Our threshold inquiry relates to the important matter of the statute of limitations and its limiting effect on Ms. Doyle's claims. Ms. Doyle's counsel has given this issue short shrift, apparently hoping to salvage Ms. Doyle's otherwise untimely claims under the "continuing violation" doctrine.  This, as will become clear, is a weak thread on which to try to hang so heavy a load.

The limitations provision of Title VII provides that a plaintiff must file a complaint with the Equal Employment Opportunity Commission (EEOC) "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).[8] Any action not filed within this time period is time-barred and cannot be brought in court. *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 836 (7th Cir. 2008). An employment

---

[8] Indiana is a "deferral" state, and thus the 300-day time limit applies rather than the 180-day limit mentioned elsewhere in the same provision. *See* 42 U.S.C. § 2000e-5(e)(1).

practice triggering the 300-day EEOC filing clock is a "discrete act or single occurrence that takes place at a particular point in time." *Id.* (citations omitted). Ordinarily, a plaintiff must thus file an EEOC complaint within 300 days of an employer action violating the statute, even if that discrete act or single occurrence "has a connection to other acts" also committed by the employer later in time. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111 (2002); *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 234 (1976).

The "continuing violation" doctrine operates in some instances to preserve the timeliness of certain violations which, if considered in isolation, would otherwise be time-barred. "A continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v. Univ. of Wisc. Bd. of Regents,* 121 F.3d 1138, 1139 (7th Cir. 1997). Under this theory, courts treat a qualifying combination of acts "as one continuous act that ends within the limitations period." *Speer v. Rand McNally & Co.*, 123 F.3d 658, 663 (7th Cir. 1997) (quoting *Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir. 1992)). A continuing violation may apply to "covert" discrimination, in which the plaintiff alleges that "the employer has, for a period of time, followed a practice of discrimination, but has done so covertly, rather than by way of an open notorious policy." *Id.* The doctrine may also apply to allegations of a hostile work environment. "Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct . . . The 'unlawful

employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Provided that an act contributing to the hostile-environment harassment occurred within the filing period, "the entire time period of the hostile environment may be considered by a court for purposes of determining liability." *Nat'l R.R. Passenger Corp.*, 526 U.S. at 117.

Thus, our review of the evidence is necessarily tied to the 300-day time limit, requiring us to determine which acts or conduct by the employer and/or union are actionable under Title VII. As we have previously noted, Ms. Doyle filed her EEOC charge against Defendants on June 16, 2012, and therefore only conduct occurring on or after August 9, 2011, or conduct that was part of a continuing violation that extended past that date can give rise to a viable Title VII claim. As is clear from the facts detailed herein, none of the pre-300 day limitations period events by these Defendants can properly be considered continuing violations.

Ms. Doyle first alleges that on two occasions in 2006, Mr. Manford subjected her to unwanted sexual advances and contact (on one occasion, Mr. Manford allegedly approached Ms. Doyle from behind and "rubbed his penis on her butt," Doyle Dep. at 59, 64-66, and on the second occasion, attempted to persuade Ms. Doyle to kiss him, though she refused). By Ms. Doyle's telling, these two instances of improper conduct towards her by Mr. Manford occurred in close succession. Taking these allegations as true, as we

must in ruling on summary judgment, it is clear that each of these incidents was a specific, discrete act, about which Ms. Doyle could have complained to her employer or union at the time, had she chosen to do so. Because these actions were complete long before August 9, 2011, Title VII claims against Defendants related to them are time-barred. *See Dasgupta,* 121 F.3d at 1139-40 (denying a continuing violation claim where "[plaintiff's] failure to bring such a suit cannot be ascribed to the ambiguous or incomplete nature of the discrimination—to his being the victim of a campaign whose discriminatory character was not apparent at the time").

Ms. Doyle also alleges in more general terms that "[s]hortly after being hired …, [she] began experiencing sexually harassing situations with co-workers in the form of sexually charged comments, sexually objectifying comments, sexually disparaging comments, and repeated offers and propositions to engage in sexual activity with coworkers." Am. Compl. ¶ 16. Again, even if we assume these facts to be true as we are required to do at the summary judgment stage, her allegations make clear that it would in no way have "been unreasonable to expect the plaintiff to sue before the statute ran on that conduct," given how obvious and pervasive she alleges the sexual harassment was. Moreover, Ms. Doyle admits that such conduct occurred only in 2006 and 2007 and concedes that no conduct of a similar sexual nature occurred from 2008 through 2012, following the Company's 2008 investigation into Ms. Doyle's husband's complaint about her work environment and the subsequent harassment training given employees. Although Ms. Doyle does contend that IMPC surreptitiously discriminated against her

following her 2008 complaint by denying her training opportunities in the operations department, it is undisputed that she was transferred to the maintenance department in 2010, where she testified she was happy and received much better training. This transfer thus severed any possible continuing violation that she alleges stemmed from her 2008 complaint. For these reasons, applying the 300-day bar is appropriate here, and thus, we do not consider any allegations used to support Ms. Doyle's claims which occurred prior to August 9, 2011, as they fall outside of the period encompassed by the filing of Ms. Doyle's EEOC Charge.

### B.    Hostile Work Environment – Count I

To establish a hostile work environment claim under Title VII, a plaintiff "must show that she was subjected to harassment because of her sex, that the harassment was severe or pervasive enough to create a hostile work environment, and that there is a basis for employer liability." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 993-94 (7th Cir. 2011) (citation omitted). Additionally, to be actionable, a hostile work environment "must be both subjectively and objectively offensive." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). "Factors in our assessment include the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.*

Here, Ms. Doyle's hostile work environment claim cannot survive summary judgment because she has failed to show both that she was subjected to harassment

*because of* her sex and that the conduct was severe or pervasive enough to satisfy the standard. Because we have found that any events which occurred prior to August 9, 2011 are time-barred, the only actions that can be considered in evaluating her hostile work environment claim are the disciplinary actions taken by IMPC against Ms. Doyle as a result of her safety violations as well as her allegations that her co-workers' often refused to talk to her and did not want to work with her.

First, there is no indication that either the disciplinary actions taken against her or her co-workers' attitude towards her was because of the fact that she is a woman. Rather, the evidence before us establishes that the disciplinary actions taken against her were due to the severity of the CPS violations she had committed, not her sex. The record shows that men were similarly disciplined for CPS violations and Ms. Doyle concedes that on one occasion, a male, Steve Ashcraft, was "escorted out of the plant for a safety violation" in contravention of the CPS policy. Doyle Dep. at 25. Ms. Doyle has offered no evidence to raise an inference that men and women were treated any differently when they committed CPS violations. Nor is there any evidence that the attitudes of her co-workers were at all related to the fact that she is a woman.

Moreover, even if Ms. Doyle could prove that the harassment of which she complains was because of her sex, she cannot demonstrate that the harassment she suffered after August 9, 2011 was sufficiently severe or pervasive to be actionable. It is well-established under Seventh Circuit law that "Title VII does not mandate admirable behavior from employers." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir.

2001) (internal quotation marks, brackets, and citations omitted).  Thus, "'simple

teasing,' offhand comments, and isolated incidents (unless extremely serious) will not

amount to discriminatory changes in the 'terms and conditions of employment.'"

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation omitted).

While the behavior of Ms. Doyle's co-workers in refusing to talk to her and/or at

times declining to work with her might have made her uncomfortable or rendered her

work experience unpleasant, there is no indication that such conduct was sufficiently

severe or pervasive as to alter Ms. Doyle's working conditions.  Additionally, Ms. Doyle

testified that when she was transferred to the Maintenance Department in 2010, she felt

like she was treated cordially by her co-workers and received group and individualized

training that she appreciated.  There is no indication that she suffered any adverse

treatment by Tanners Creek management or her co-workers after she transferred to

Maintenance, at least not until she began to face discipline in 2011 following her repeated

safety violations.  But Ms. Doyle cannot rely on IMPC's legitimate application of

disciplinary corrective measures to establish a claim for hostile work environment as

there is no indication that the disciplinary measures taken by IMPC were anything other

than appropriate responses to Ms. Doyle's continued, serious violations of the CPS.  For

these reasons, Ms. Doyle's claim that IMPC subjected her to a hostile work environment

cannot survive summary judgment.

   C.     **Retaliation – Count II**

Title VII prohibits an employer from discriminating against an employee for opposing a practice made unlawful by the Act. 42 U.S.C. § 2000e-3(a). A plaintiff alleging retaliation under Title VII may proceed under either the direct or indirect method of proof. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014). To prove a case of retaliation under the direct method of proof, a plaintiff must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action at the hands of her employer; and (3) there was a causal link between the two." *Fine v. Ryan Int'l Airlines,* 305 F.3d 746, 752 (7th Cir. 2002).

To establish a retaliation claim based on the burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973), a plaintiff must first show that "(1) after lodging a complaint about discrimination, (2) only [s]he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) [s]he was performing [her] job in a satisfactory manner." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (quotation marks and citation omitted). The burden then shifts to the employer to present "unrebutted evidence of a noninvidious reason for the adverse action." *Id.* Here, however, for the reasons detailed below, Ms. Doyle is unable to establish a *prima facie* case of retaliation, and thus, we need not progress further in the analysis.

Ms. Doyle claims that she was subjected to retaliation in 2011 and 2012 following her 2008 complaint to Ms. Sellers regarding harassment. IMPC concedes for purposes of this motion that Ms. Doyle's 2008 complaint to Ms. Sellers constitutes "protected

activity" as defined by Title VII. There is also no dispute that Ms. Doyle was disciplined between July 29, 2011 and May 7, 2012. Under the indirect method of proof, Ms. Doyle has wholly failed to introduce evidence sufficient to satisfy the second and fourth prongs of the *prima facie* case, to wit, that similarly situated employees were treated differently or that she was adequately performing her job responsibilities.[9]

Ms. Doyle cannot show that *only* she, because of her 2008 complaint, was subjected to adverse action. Rather, the evidence shows that a number of employees who did not engage in protected activity were disciplined similarly to Ms. Doyle after violating the CPS like she had. For example, Ross Cutter was written up for CPS violations; Matt McClure, John Eric Dawson and Steve Ashcraft were each suspended for CPS violations; Randy Bath was discharged for CPS violations; Steve Ashcroft was required to complete a PIP after a CPS violation; Joe Carrigan was given a last chance agreement; and John Wise testified that he knew of a male employee who had been required to go to the EAP. There is no evidence that each of these employees complained of illegal harassment before they were disciplined.[10]

---

[9] Ms. Doyle also makes a cursory argument under the direct method of proof, but it is equally unavailing. There is absolutely no evidence that any adverse action Ms. Doyle suffered was caused by her complaint of harassment. She made her harassment complaint in 2008 and was not subjected to any relevant adverse action until 2011 and 2012. While an "interval of a few weeks or even months may provide probative evidence of the required causal nexus," *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012), it is well established under Seventh Circuit law that gaps of three and four years between protected activity and adverse employment actions raise no inference of retaliation. *See Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 787 (7th Cir. 2007) (holding that gaps of eight months and two years between protected activity and alleged retaliatory acts defeats any inference of retaliation).

[10] One employee, Ms. Zinser, complained about sexual harassment in 2009 and was also written up and suspended for CPS violations, but she testified that she did not believe she was subjected

The record is also replete with examples of Ms. Doyle failing to satisfactorily perform her job responsibilities. Ms. Doyle admits that she picked up red tags in July 2011 in violation of the CPS; signed onto the wrong clearance in December 2011; and was operating the radial arm drill press when the drill bit broke, after she had been instructed to use another piece of equipment instead. Ms. Doyle cannot reasonably dispute the seriousness of these infractions. There is also evidence that Ms. Doyle was involved in other minor CPS violations during the time period relevant to this litigation for which she was not formally disciplined. Clearly, Ms. Doyle cannot show that she was performing satisfactorily at the time she suffered adverse action.

Although Ms. Doyle contends that these violations resulted from IMPC's failure to adequately train her, the evidence does not support that conclusion. Once she transferred to the Maintenance Department in 2010, she received the exact same training as all the other MMJs, including Ms. Zinser, Nick Hyde, and Kelly Baker. As part of that training, Ms. Doyle learned to "stop when uncertain" and wait for someone with more experience to assist. Ms. Zinser, who was also involved in the drill bit incident, testified that she and Ms. Doyle had very little experience with the radial arm drill, and they should have stopped and waited for someone with more experience to help them or used the torch to perform the task as they had been instructed. Zinzer Dep. at 43. Ms. Doyle's failure to sign the proper clearance form in December 2011 also cannot be connected to a lack of

_____

to retaliation. Moreover, as with Ms. Doyle, the fact that Ms. Zinser was disciplined for CPS violations in the same manner as other employees who had not complained of illegal harassment clearly raises no inference of retaliation.

training as she admits that she failed to read the document to ensure that she was signing onto the correct clearance. Doyle Dep. at 142-45. Thus, the evidence shows not that Ms. Doyle received inadequate training but rather that she did not follow the training and instructions she had been given.

Because Ms. Doyle has failed to show that similarly situated employees who did not engage in statutorily protected activity were treated more favorably nor that she was performing her job satisfactorily at the time she suffered adverse employment actions, she is unable to establish a *prima facie* case of retaliation. Accordingly, her retaliation claim brought pursuant to Title VII cannot survive summary judgment.

### D.     Sex Discrimination – Count III

Federal courts have described two pathways by which a claimant may establish a claim for sex discrimination: the direct method and the indirect method. A plaintiff can prevail under the direct method "by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008) (quoting *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004)) (further citations omitted).

A plaintiff may prove discrimination "indirectly" via the burden-shifting method utilizing the *McDonnell Douglas* framework. Under this approach, a plaintiff first bears the burden of setting forth a *prima facie* case for discrimination, which she may satisfy by showing that: "(1) [s]he is a member of a protected class, (2) [s]he met h[er] employer's legitimate job expectations, (3) [s]he suffered an adverse employment action, and (4)

similarly situated employees outside of the protected class received more favorable treatment." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013) (quoting *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)). If the plaintiff crosses this threshold, then the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. If the employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination. *Morgan*, 724 F.3d at 996.

Ms. Doyle argues that she can prove sex discrimination under both the direct method of proof using a "convincing mosaic of circumstantial evidence" as well as via the indirect method of proof. However, most of the evidence on which she relies under both the direct and indirect methods falls outside the 300-day limitations period, including Mr. Manford's sexual harassment of her in 2006 and her contention that she received fewer training opportunities in 2008 following her complaint to management. The remaining evidence Ms. Doyle points to that is not time-barred is insufficient to establish sex discrimination under either method of proof. For the same reasons discussed above in denying Ms. Doyle's retaliation claim, her sex discrimination claim fails under the indirect method of proof because she is unable to demonstrate that she received less favorable treatment than a similarly situated employee outside the protected class[11] or that she was satisfactorily performing her employer's legitimate job

---

[11] Ms. Doyle argues that Ms. Zinser was treated more leniently even though they were both involved in the drill bit incident. It is true that Ms. Doyle was terminated and Ms. Zinser

expectations. While Ms. Doyle argues that the punishment she received for her CPS

violations was "too harsh," that determination is not within our purview as we do "not sit

as a super-personnel department with authority to review an employer's business decision

as to whether someone should be fired or disciplined…." *Hague v. Thompson Distrib.*

*Co.*, 436 F.3d 816, 824 (7th Cir. 2006).

Ms. Doyle's arguments under the direct method of proof are equally unavailing as

she relies on this same evidence. Because Ms. Doyle has failed to produce any evidence

to raise the inference that IMPC's reasons for her discipline and discharge were the result

of sex discrimination, her discriminatory discharge and disparate treatment claims fail as

a matter of law, and thus, are dismissed.

### E.  Title VII Claim Against the Union – Count IV

Ms. Doyle's only claim against the Union is that it declined to arbitrate her

grievance for reasons of discrimination or retaliation in violation of Title VII.[12]  To

---

received only a written warning following the incident.  But in order to show that her termination was the result of sex discrimination, Ms. Doyle must present a similarly situated employee *outside the protected class* who was treated differently.  Ms. Zinser is also a woman, and thus, the fact that she may have received less harsh discipline is not evidence of sex discrimination. Moreover, Ms. Zinser did not have as extensive of a disciplinary history as Ms. Doyle and thus was not similarly situated on that basis.

[12] In her response to the Union's motion for summary judgment, Ms. Doyle devotes the majority of her brief to a number of arguments regarding the Union's failure to address the underlying harassment she contends she suffered at the hands of IMPC, such as Mr. Manford's alleged sexual harassment of her and her alleged failure to receive equal access to training following her 2008 report to IMPC of such harassment.  But the only claim set forth in Ms. Doyle's complaint against the Union is its alleged failure to pursue her grievance regarding her termination to arbitration for reasons of discrimination or retaliation.  Any claim based on the Union's failure to address alleged sexual harassment in 2006 or a failure to train in 2008 is barred by the statute of limitations as discussed above.  In addition, any such claim would be subject to dismissal for failure to exhaust administrative remedies because her EEOC charge asserts only that the Union

prevail on this claim, Ms. Doyle must show that the Union would have pursued her grievance if she had been a man or if she had not complained about discrimination. *See Green v. Am. Fed. of Teachers/Ill. Fed. of Teachers Local 604*, 740 F.3d 1104, 1107 (7th Cir. 2014) ("If the union would have processed [the plaintiff's] grievance or represented him … had he been white – or had he refrained from complaining about other discriminatory episodes – then the union violated Title VII."). As with her discrimination and retaliation claims brought against IMPC, Ms. Doyle can make this showing using either the direct or indirect methods of proof that have been described in detail above.

Ms. Doyle concedes she has no direct evidence of discriminatory animus, but contends that she has presented sufficient evidence under both the indirect method and by presenting a "convincing mosaic" of evidence of discrimination to survive summary judgment. However, again, Ms. Doyle relies heavily on incidents occurring before the 300-day period to support her case, such as Mr. Manford's alleged sexual harassment of her in 2006 and alleged failure to provide her equal training opportunities in the operations department following her 2008 complaint of sexual harassment. The evidence she has adduced that is properly considered does not raise any genuine issue of material fact regarding whether the Union declined to pursue her grievance to arbitration based on unlawful discriminatory or retaliatory reasons.

---

improperly failed to arbitrate her grievance. *See Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 139 (7th Cir. 1994) (holding that allegations that are not included in an EEOC charge cannot be contained in a subsequent complaint filed in district court).

Ms. Doyle's claim fails under the indirect method of proof at the outset because she has failed to identify a similarly situated union member who was treated more favorably than she, and thus, she cannot make out a *prima facie* case of discrimination or retaliation. Ms. Doyle does not dispute the Union's representation that there are no similar cases of employees outside the protected class or who did not engage in protected activity with multiple CPS or safety violations who were terminated while on a last-chance agreement. In response, Ms. Doyle argues only that the Union arbitrated the cases of two males, but would not arbitrate her case. However, those two cases[13] involved long-time employees who were discharged when the Company concluded that medical conditions prevented them from wearing a breathing apparatus required for emergencies. Clearly, these facts are not comparable to the case before us and thus cannot be considered comparable to Ms. Doyle.

Nor can Ms. Doyle succeed under the direct method of proof using circumstantial evidence. She argues that Mr. Manford's involvement in the grievance process, coupled with her belief that the Union failed both to adequately prepare her grievance and to properly investigate her case before declining to pursue arbitration, establishes that the Union's decision was based either on discrimination or retaliation. For the reasons detailed below, we disagree.

---

[13] Ms. Doyle does not dispute that these are the only two termination cases pursued to arbitration by the Union in recent years.

Ms. Doyle first argues that Mr. Manford's involvement in pursuing her grievance tainted the process, given their prior history. But the evidence shows that Mr. Manford, at most, played a de minimus role in representing her in the disciplinary actions prior to her termination. Mr. Manford was present during her initial disciplinary meeting following her first CPS violation, but when Ms. Doyle objected to his presence, stating, "there is a history there," Mr. Manford was removed from the meeting and replaced by Mr. Wise, whom Ms. Doyle herself had requested and against whom she has alleged no improper behavior. Doyle Dep. at 187-88. Mr. Manford was also present during a meeting when the Plant Manager laid out his expectations for Ms. Doyle upon her return to work from mandatory sick leave, but she testified that she did not object to his presence at that meeting. *Id.* at 189-90.

Mr. Manford did file the initial grievance for Ms. Doyle protesting her termination, but although Ms. Doyle argues that it was improper for him to have written the grievance, she has adduced no evidence to show that there were any deficiencies in the manner in which the grievance was drafted or that it prejudiced her interests in any way. Finally, Ms. Doyle objects to the fact that Mr. Manford was at the membership meeting where her case was discussed and was allowed to vote on whether or not to arbitrate her grievance along with the rest of the Union membership. However, the evidence shows, at most, that Mr. Caswell, the presiding officer at that meeting, was aware only that some years before there had been some unspecified problems between Ms. Doyle and Mr. Manford, but that he was unaware of Ms. Doyle's claim of sexual

harassment and thus had no reason to ask Mr. Manford to recuse himself.[14]  There is no

indication that Mr. Manford spoke for or against proceeding to arbitration at the meeting

in any event or otherwise unduly affected the outcome of the final decision as his vote

was only one of twelve in an 11-1 decision not to pursue arbitration.  Nor is there any

indication that the Union somehow deliberately permitted him to participate in the

meeting because of gender discrimination or retaliation.

Ms. Doyle has also failed to point to any evidence to support the conclusion that

the Union either failed to adequately prepare the grievance or investigate her case before

declining to pursue arbitration.  Rather, the evidence in the record establishes that the

Union properly considered the fact that Ms. Doyle had signed a Last Chance Agreement,

essentially eliminating her right to challenge a discharge based on a safety violation, as

well as the district UWUA representative's opinion that the grievance would likely fail.

Based on those facts, the Union contends it determined that pursuing the grievance to

arbitration would not be a wise use of resources.  The Seventh Circuit has recognized that

the "appropriate allocation of limited resources" is one valid factor that a union can take

into account as part of its evaluation of the merits of a grievance and how far to pursue it.

*Baker v. Amsted Indus., Inc.*, 656 F.2d 1245, 1250 (7th Cir. 1981).  Although Ms. Doyle

faults the Union for not adequately investigating her case before declining to pursue

---

[14] Mr. Caswell testified that he was unaware of any prior complaints made by Ms. Doyle
regarding Mr. Manford's behavior.  Ms. Doyle testified that she recalled talking to Mr. Caswell
generally about experiencing sexual harassment by Mr. Manford during one of the disciplinary
meetings, but when asked further, she conceded she did not "recall whether [she] used the words
'sexual harassment.'"  Doyle Dep. at 246.

arbitration, she concedes that she herself did not attend the meeting at which the decision was being made, despite having been advised of the meeting and the importance of her attending to provide whatever detail she believed the Union was missing. She contends that was because she did not want to plead her case in front of Mr. Manford (then-Local Vice President), but she never raised this concern with anyone in advance of the meeting.

In summary, it is well-established that a union is not compelled to take every grievance all the way to arbitration. *See Vaca v. Sipes*, 386 U.S. 171, 191-92 (1967). Ms. Doyle has failed to present sufficient evidence to establish that the Union's decision not to pursue arbitration in her case was based on any unlawful considerations, such as her sex or the fact that she had engaged in statutorily protected activity approximately four years earlier. Accordingly, her only claim against the Union, to wit, that it denied pursuing her grievance based on discrimination or retaliation, cannot survive summary judgment.

## III.    Conclusion

For the reasons detailed above, we <u>GRANT</u> the Motions for Summary Judgment filed by all Defendants. Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date: _____03/31/2015_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Julie C. Ford
DOLL, JANSEN, FORD & RAKAY
jford@djflawfirm.com

Steven Sams
STEVEN SAMS, P.C.
stevensamslaw@att.net

Douglas B. Bates
STITES & HARBISON, LLP
dbates@stites.com

Karen M Paulin
STITES & HARBISON, PLLC
kpaulin@stites.com